IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MICHAEL P. SMITH,**

      **Petitioner,**

      v.

**WARDEN, ROSS CORRECTIONAL
INSTITUTION,**

      **Respondent.**

      **Case No. 2:14-cv-02018**
      **Judge Marbley**
      **Magistrate Judge King**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition,* ECF No. 1, Respondent's *Return of Writ*, ECF No. 5, Petitioner's *Traverse*, ECF No. 14, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**Facts and Procedural History**

The Ohio Fifth District Court of Appeals summarized the facts and procedural history of the case as follows:

> Kyle Carter's presence, along with his dog, in an apartment building at 903 Stewart Avenue, Cambridge, Ohio became a source of anxiety for Smith. In addition, Smith contended that Carter neglected to clean up after his dog, leaving waste in the front lawn. Smith first tried complaining to the leasing company, but Carter and his dog remained on the premises. Verbal altercations occurred between the two for some time.
>
> On March 5, 2011 Jessica Beckett, a resident of the apartment building observed Smith walk up the shared stairway that led to Becket's apartment and another apartment where Kyle Carter was currently staying. Becket testified Smith was banging on the door and yelling at them saying, "he wanted the squatters out of here and their damn dog out of here, and he was going to kill them, and he was going to beat their ass." Becket testified she was very

scared of this event and eventually decided to purchase a weapon for protection.

Carter and his girlfriend Katrina Adamik were alarmed. Carter called a friend, Trevon Bundy, and reported what had transpired between them and Smith in a voicemail message to Bundy's telephone.

On March 8, 2011, Smith again confronted Carter to tell him that he and his dog were violating the terms of the lease and he had to go. As the verbal altercation escalated, Carter's friend from across the street, Cody Heskett, came to assist him. Smith was yelling at the two young men to come over to his porch so he could kick their ass. The shouting match grew louder, but Smith never left his porch. Heskett tore off his shirt and beat his chest, as if preparing for a fight with Smith. Carter responded to the threats and shouts with his own angry and violent words. Smith claimed that the two young men said that they had a gun back at Mr. Heskett's house, which frightened Smith. Heskett later told his brother that his intention was to go back to the house and get his shotgun so he could shoot Smith.

Smith ran inside, grabbed his Springfield .45 Caliber semiautomatic handgun, and fired a shot from his porch toward the street at Cody Heskett. That shot missed Heskett. Smith fired a second time striking and eventually killing Kyle Carter.

Moments before the shooting, Ms. Beckett testified that she heard Smith yell, "I'm going to get my .45 and blow you up," which she took to mean he was going to get a gun out of his apartment. At this point, Beckett called the police. However, a concerned citizen, Linda Phillips had already called the police to report that she had heard shouts threatening violence and it looked like an old man was antagonizing two boys who were out in the street.

On or about 4:09 p.m. on that day, Lieutenant Kevin Love and Patrolman David Long of the Cambridge Police Department were on routine patrol. They received a call from dispatch, indicating some type of disturbance in the area of the apartment building. Lieutenant Love indicated it took them about a minute to travel from their location, to the dispatched location. As the officers were pulling to the dispatched intersection, Lieutenant Love testified that he heard a gunshot. Lieutenant Love then saw a man in a white T-shirt hunch over, and put his hands on his stomach as he crossed 9th Street from the east side, to the west side of the street staggering rather slumped over. The man made it across the street,

crossing between two parked cars, fell to his knees, still clenching himself, he bent over and put his forehead in the grass and then immediately fell over on his side. The Lieutenant testified there was a lot of yelling and confusion. Lieutenant Love further testified at first he could not identify the man, but later identified him as Kyle Carter.

From their location, the Lieutenant and Patrolman deciphered through the yelling, that the man who shot Carter was in the big white house across the street, 903 Stewart, which is an apartment building on the northeast corner of that intersection.

Carter Baldwin and Terrence Holdren each testified that, as they pulled up to the stop sign at Stewart Avenue and 9th Street, they saw Smith take aim at the two young boys who were standing nearby. Baldwin and Holdren indicated that they saw Smith, with his arms together, holding a gun on the banister, aiming it at one of the kids. Baldwin testified that he believed the man with the gun was aiming at one of the kids.

After the shooting, Smith found a car with the keys still in it and drove off. He thought better of fleeing town, so he instead went to Brenda Berger, a family friend, to seek help. Smith told Mrs. Berger that he had shot at the two young men. He told Mrs. Berger that he was scared for his life, and he reacted the only way he could think of to try to scare them. He said that he had never meant to hurt the young men, just to scare them and protect himself.

Knowing that Smith did not actually own a car, Mrs. Berger told Smith that she would not let him stay in the house and that he could not have the stolen car there. Smith left briefly to return the car to a safe location. While he was gone, Mrs. Berger called the police and informed them that Smith would be on her porch for them to come get him. After both Smith and law enforcement arrived at the house, Smith complied with the officers' orders and calmly turned himself in to the police. Soon after being taken to the county jail, Smith learned that he had caused Carter's death. When he learned this, Smith broke down and relayed to the police the events of that day.

Smith was charged with aggravated murder of Carter, with instructions in the alternative for murder and voluntary manslaughter. He was also charged with attempted aggravated murder of Mr. Heskett, with instructions in the alternative for attempted murder and attempted voluntary manslaughter. Mr.

Smith also faced charges for felonious assault against Heskett, grand theft of the car, and having a weapon under a disability.

After a six day jury trial Smith was convicted of the lesser offenses of murder and attempted murder, grand theft, and having a weapon under a disability. His conviction for felonious assault merged with his conviction for attempted murder. He was sentenced for the murder to 15 years to life, plus a repeat violent offender specification of 10 years and a firearm specification of 3 years. He was sentenced for the attempted murder to 10 years plus three for the repeat violent offender specification. His sentence for three years for the theft and one year for the weapon under disability charge ran concurrently to his sentences for murder and attempted murder. His total sentence was 48 years to life.

ASSIGNMENTS OF ERROR

Smith raises five assignments of error,

"I. THE TRIAL COURT'S ADMISSION OF A VOICEMAIL RECORDED BY MR. CARTER VIOLATED MR. SMITH'S CONSTITUTIONAL RIGHT TO BE CONFRONTED WITH THE WITNESSES AGAINST HIM. SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION; SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION; *CRAWFORD V. WASHINGTON*, 541 U.S. 36, 124 S.CT. 1354, 158 L.ED.2D 177 2004). (STATE'S EXHIBIT CC; T.T. AT 774).

"II. THE TRIAL COURT'S ADMISSION OF A VOICEMAIL RECORDED BY MR. CARTER VIOLATED THE PROHIBITION ON HEARSAY EVIDENCE, AS THE RECORDING WENT BEYOND MERELY ESTABLISHING MR. CARTER'S FEAR OF MR. SMITH, IN VIOLATION OF MR. SMITH'S RIGHT TO DUE PROCESS. FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. (STATE'S EXHIBIT CC; T.T. AT 774).

"III. THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE STATE TO INTRODUCE UNRELIABLE AND UNSCIENTIFIC EXPERT TESTIMONY, VIOLATING MR. SMITH'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION; EVID.R. 702; *DAUBERT V. MERRILL DOW PHARMACEUTICALS, INC*., 509

> U.S. 579, 113 S. CT. 2786, 125 L. ED. 2D 469 (1993). (JULY 25, 2011 ENTRY; JULY T. AT 102).
>
> "IV. MR. SMITH'S CONVICTIONS FOR MURDER AND ATTEMPTED MURDER ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE, IN VIOLATION OF HIS RIGHT TO DUE PROCESS. FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ARTICLE 1, SECTION 16 OF THE OHIO CONSTITUTION. (MAY 10, 2012 JUDGMENT OF CONVICTION).
>
> "V. THE TRIAL COURT'S ERRORS IN ADMITTING TESTIMONIAL STATEMENTS WITHOUT CROSS–EXAMINATION, IN IMPROPERLY ADMITTING HEARSAY EVIDENCE, IN ADMITTING UNSCIENTIFIC AND UNRELIABLE EXPERT TESTIMONY, AND THE JURY'S ERROR IN MISCONSTRUING THE WEIGHT OF THE EVIDENCE, CUMULATIVELY DENIED MR. SMITH HIS FEDERAL AND STATE RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION. (MAY 10, 2012 JUDGMENT OF CONVICTION)."

*State v. Smith*, No. 2012-CA-17, 2013 WL 1281999, at *1-3 (Ohio App. 5th Dist. March 18, 2013)[sic]. On March 18, 2013, the appellate court affirmed the judgment of the trial court. *Id*. On July 24, 2013, the Ohio Supreme Court declined jurisdiction to hear the appeal. *State v. Smith*, 136 Ohio St.3d 1452 (Ohio 2013).

On October 21, 2014, Petitioner filed the *Petition* pursuant to 28 U.S.C. § 2254. He alleges as follows:

> In a shooting case, photographs and testimony of reenactments using a laser beam to show bullet trajectory cannot be admitted as scientific evidence of only line of sight, and the prejudice from their admission cannot be cured by a jury instruction. *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).
>
> At Mr. Smith's trial, Special Agent Stephen Burke testified as an expert regarding a series of photographs depicting a reenactment of

5

>  the shooting incident using a laser beam. After a pretrial hearing on the admissibility of the evidence under *Daubert,* the trial court allowed the photographs to be admitted as scientific demonstration of line-of-sight between the porch and the street. But, Agent Burke admitted that the photographs were based on assumptions and guesses. Because assumptions and guesses are not scientific data, the photographs were unreliable demonstrations of line of sight. And, the photographs inherently acted as reenactments of the shooting and of the bullet trajectory, reenactments that Agent Burke was not qualified to prepare.

Respondent contends that this claim fails to offer a basis for federal habeas corpus relief.

**Standard of Review**

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court recently described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, ___ U.S. ___, ___, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

The factual findings of the state appellate court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

6

28 U.S.C. § 2254(e)(1). "Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). *See* 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit recently explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley,* 706 F.3d at 748 - 49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, –––U.S. ––––, ––––, 131 S.Ct. 1388, 1398 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith,* 539 U.S. 510, 520 - 21,

7

(2003) (internal quotation marks omitted) (citing *Williams v. Taylor*, 529. U.S. at 409, and *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 131 S.Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir.2009) ("'[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.'" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*))); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before it at the time it rendered its decision. *Pinholster*, 131 S.Ct. at 1398. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id*. at 1399.

**Discussion**

Petitioner argues that he was denied a fair trial by the admission into evidence of photographs and testimony by Special Agent Stephen Burke regarding a re-enactment, using a laser beam, of the shooting. The state appellate court rejected this claim as follows:

> . . . Smith challenges the report and opinion of Special Agent Stephen Burk[e], a crime scene reconstruction expert. Smith argues that the trial court abused its discretion in allowing Agent Burke to testify as an expert regarding the position of the victim and

8

shooter, an opinion that Smith contends is beyond the scope of Agent Burke's training and experience. Smith further contends that Agent Burke's laser sighting tests are mere guesswork and not based upon reliable scientific facts.

The Bureau of Criminal Identification and Investigation employ [sic] special Agent Burke in the major crimes division, crime scene unit. In the case at bar, he utilized a laser that projects a straight line to illustrate the line of sight from Smith's porch. Special Agent Burke testified that a laser is used instead of a length of string to indicate angle and line of sight. He testified that the laser can more accurately span long distances than a string because the string is affected by gravity. The unobstructed line of sight test is used to demonstrate the possibility or the probability that a gunshot could be taken from a certain location.

Special Agent Burke obtained blood spatter evidence from the street, which indicted [sic] the location of the decedent when he was shot. Special Agent Burke used a tape measure to obtain the distances of the blood spatter and from Smith's porch. Special Agent Burke also photographed a car that had a bullet hole through the rear, passenger side window.

The laser test was used in this case because a tree was located between Smith's porch and the street where the blood spatter was found. The test demonstrated a clear unobstructed line of sight between two branches of the tree to the location where the blood spatter began on the sidewalk. A similar test was made from the vehicle to the porch. In addition, a male subject approximating the height and weight of the descendent [sic] was placed on the blood spatter. The laser's position on the subject in various positions was demonstrated and photographed.

At trial Special Agent Burke was permitted to give his expert opinion that, [sic] the shooter would have had a clear unobstructed line of sight from Smith's porch to the damaged car window and through the tree to the area where the blood spatter began. The state also presented photographs of the laser sight demonstration conducted at the scene of the crime.

In the case at bar, the Court held a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469(1993) prior to admitting Special Agent Burke's opinion at trial.

In general, courts should admit expert testimony whenever it is relevant and satisfies Evid.R. 702. *State v. Nemeth* (1998), 82 Ohio St.3d 202, 207, 694 N.E.2d 1332; see, also, *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444. Thus, the trial judge must perform a "gate keeping" role to ensure that expert testimony is sufficiently (a) relevant and (b) reliable to justify its submission to the trier of fact. *See Kumho Tire* [ (1999) ], 526 U.S. [137] at 152, 119 S.Ct. 1167; *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 589, 113 S .Ct. 2786; *Nemeth,* 82 Ohio St.3d at 211, 694 N.E.2d 1332; *Douglass,* 153 Ohio App.3d 350, 2003–Ohio–4006, 794 N.E.2d 107, at ¶ 32.

In performing its gate keeping function, the trial court's starting point should be Evid.R. 702, which provides that a witness may testify as an expert if all of the following apply: "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable, scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply: (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) The design of the procedure, test, or experiment reliably implements the theory; (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

*Abon, Ltd. v. Transcontinental Ins. Co*., 5th Dist. No.2004–CA–0029, 2005–Ohio–3052, citing *Valentine v. Valentine* (2001), 158 Ohio App.3d 615, 628–631 2004–Ohio–4521, 821 N.E.2d 580(2001)(Internal quotation marks omitted).

Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *State v. Hartman,* 93 Ohio St.3d 274, 285, 754 N.E.2d 1150(2001); *State v. Williams*, 4 Ohio St.3d 53, 58, 446 N.E.2d 444(1983).

Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman*, 93 Ohio St.3d at 285; *State v. Baston*, 85 Ohio St.3d 418, 423, 709 N.E.2d 128(1999).

"A court resolving a reliability question should consider the 'principles and methods' the expert used 'in reaching his or her conclusions, rather than trying to determine whether the conclusions themselves are correct or credible.' *Nemeth*, 82 Ohio St.3d at 210, 694 N.E.2d 1332; see, also, *Miller*, 80 Ohio St.3d 607, 687 N.E.2d 735, paragraph one of the syllabus. As the *Daubert* court stated, in assessing reliability, '[t]he focus * * * must [generally] be * * * on principles and methodology, not on the conclusions that they generate.' *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469.

"A trial court may not, therefore, exclude expert testimony simply because it disagrees with the expert's conclusions. Instead, if the expert followed methods and principles deemed valid by the discipline to reach his opinion, the court should allow the testimony. See *Paoli*, 35 F.3d at 742 ('an expert's testimony is admissible as long as the process or technique the expert used in formulating the opinion is reliable'). The traditional adversary process is then capable of weeding out those shaky opinions. See *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469" *Valentine v. Valentine*, 158 Ohio App.3d 615, 628–631; 2004–Ohio–4521, 821 N.E.2d 580(2001), ¶¶ 23–31.

To a certain extent, Special Agent Burke's opinions are cumulative; Smith admitted he fired the gun from his porch and several witnesses observed him. Thus, any error in the admission of the testimony would be harmless. The real crux of Smith's contention is that the tree and the topography of the land could have prevented him from having a clear view of the decedent before he fired depending on where he stood on the porch. Further, Smith argues that he shot wildly and did not aim at either young man.

In the case at bar, Smith's arguments concerning the use of a laser light instead of a string, and the uncertainty concerning the precise positions of the shooter and the decedent at the time the shots were fired, go more to the weight of the evidence rather than to its admissibility.

> "Questions about the certainty of the scientific results are matters of weight for the jury. For example, in discussing the fact that a hair sampling technique only showed similarities between the hairs and could not show a match with certainty, '[t]he lack of certainty went to the weight to be assigned to the testimony of the expert, not its admissibility, and defense counsel did a creditable job of arguing to the jury that it should be assigned little weight.' *United States v. Brady,* 595 F.2d 359, 363 (6th Cir.1979). And, in general, criticisms touching on whether the lab made mistakes in arriving at its results are for the jury." *United States v. Bonds*, 12 F.3d 540, 563(6th Cir.1979). See also, *State v. Pierce*, 64 Ohio St.3d 490, 597 N.E.2d 107(1992).
>
> Even if we were to assume the admission of this evidence was error, it was harmless beyond a reasonable doubt. Crim .R. 52(A); *State v. Zimmerman*, 18 Ohio St.3d 43, 45, 479 N.E.2d 862, 863(1985). There was no prejudicial error in allowing Special Agent Burke to testify in this case. Agent Burke's testimony did not include conclusions on bullet trajectory. The trial court also instructed the jury to use these demonstrations only for line-of-sight, not as recreations
>
> Accordingly, Smith's substantial rights were not violated by the admission of Special Agent Burkes [sic] testimony.

*State v. Smith*, 2013 WL 1281999, at *7-10.

Petitioner argues that the admission of Burkes' testimony violated *Daubert* and denied him due process, because his testimony was unreliable and lacked support in the scientific community.  He disputes the state appellate court's finding that any error in the admission of such testimony was harmless.

However, federal habeas review of state court evidentiary rulings is extremely limited. *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir.1990). Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *see also Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). When such errors

12

are alleged, the federal court's inquiry in reviewing these claims is directed to whether the evidence was rationally connected to the crime charged. *Carter v. Jago*, 637 F.2d 449, 457 (6th Cir. 1980). Such are the circumstances here.

*Daubert,* 509 U.S. at 579, concerns the Federal Rules of Evidence, and does not govern whether scientific evidence in state court proceedings is constitutionally admissible. *Payne v. Bobby*, No. 2:05-cv-050, 2006 WL 508784, at *23 (S.D. Ohio Feb. 27, 2006)(citing *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998); *Kelly v. Larkins,* 251 F.3d 408, 419 (2nd Cir. 2001); *Kinder v. Bowersox*, 272 F.3d 532, 545 n .9 (8th Cir. 2001)). *See also Adams v. Bradshaw*, 484 F.Supp.2d 753, 790 (N.D. Ohio 2007)(citations omitted).

In short, the decision of the state appellate court did not contravene or unreasonably apply federal constitutional law as determined by the United States Supreme Court.

**Recommended Disposition**

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendati*on will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

   *s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge
November 16, 2015